UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

MARK WEBSTER and DARREL EDMOND,   )
  )
        Plaintiffs,   )
  )
     vs.   )      1:10-cv-1622- SEB-DML
  )
CITY OF INDIANAPOLIS,   )
  )
        Defendant.   )
  )

**COMBINED ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND PLAINTIFFS' MOTION TO DISMISS**
(Docket Nos. 34 & 49)

This case arises out of the plaintiffs' employment with the City of Indianapolis Department of Parks and Recreation.  It originated in state court, filed by the two plaintiffs as two separate cases. The two state cases were removed to federal court and, later, with the consent of the parties, the two federal cases were consolidated into the above-captioned single cause.  Consolidation was deemed appropriate because the two cases arise out of the same set of facts and circumstances and the plaintiffs, represented by the same lawyers, advance identical claims.

Now before the Court are the City's Motion for Summary Judgment (filed on November 14, 2011 at Docket No. 34) and Plaintiffs' Motion to Dismiss and Remand Case to State Court (filed on February 13, 2012 at Docket No. 49).  For the reasons explained below, we: (1) GRANT Plaintiffs' motion to dismiss Counts II, III, and IV of their respective complaints; (2) DENY Plaintiffs' motion to remand their remaining state law defamation claims to state court; and (3) GRANT summary judgment in favor of the City with respect to Plaintiffs' defamation claims.

## I.  PRELIMINARY MATTER

In responding to the City's Motion for Summary Judgment, Plaintiff Darrell Edmond asserts

for the first time that his Complaint contained a critical typographical error that has been repeated

in subsequent filings and court orders.  Specifically, in his Complaint, his last name was misspelled

as Edmond<u>s</u>; however, his last name is, in fact, spelled Edmond – without an "s."  Because the

record and judgment herein should reflect the proper spelling of Plaintiff Edmond's last name, the

Court directs the Clerk of the Court to correct the docket.

## II.  PLAINTIFFS' MOTION TO DISMISS
## COUNTS II, III, AND IV OF THEIR RESPECTIVE COMPLAINTS

On November 14, 2011, the City filed its Motion for Summary Judgment, supporting brief,

and designation of evidence addressing all of the claims advanced by the plaintiffs.  Three months

later, on February 13, 2012, Plaintiffs filed a Motion to Dismiss seeking to voluntarily dismiss all

of their claims, except for their state law defamation claims.  They then asked that their defamation

claims be remanded to state court, urging us not to exercise our supplemental jurisdiction over those

remaining pendent claims.

Because Plaintiffs wish to voluntarily dismiss Counts II, III, and IV of their respective

Complaints, we hereby DISMISS those claims WITH PREJUDICE.[1]  However, we decline to

remand this case to state court.

This action has been pending in federal court for twenty-two (22) months, and we have

before us a  fully briefed summary judgment motion that is ready to be decided on the merits.  It is

true that the sole remaining issue presents a pure question of state law; however, Indiana defamation

---

[1]    Count II of both Complaints asserted a claim for age discrimination "in violation of
both the U.S. and Indiana Constitutions."  Count III of both Complaints asserted a claim for
wrongful termination, and Count IV of both Complaints asserted a claim for negligence.

law is well-settled, and this case requires nothing more than a simple application of the law to the

facts.  It presents no novel issues that might necessarily or more appropriately be decided by a state

court.

Also influencing our decision to retain this case and decide it on its merits is the weak

manner in which Plaintiffs have prosecuted it.  As discussed in more detail below, the case did not

start out well in that Plaintiffs' Complaints were so seriously deficient that their defamation claims

likely would not have survived a motion to dismiss.[2]  Then, Plaintiffs failed to conduct any written

discovery, take any depositions of City employees, or identify any experts in accordance with the

deadlines established in the Court's Case Management Plan – a fact which Plaintiffs do not dispute.

[Defendant's Response to Plaintiff's Motion to Dismiss and for Remand of Case to State Court, ¶¶

9 - 12 (Dkt. No. 58); Plaintiffs' Reply (Dkt. No. 59) (notable for the absence of any argument

disputing the City's assertion).]  In addition, Plaintiffs did not timely respond to the City's discovery

requests and delayed in disclosing the documents they rely upon in support of their defamation

claims until they filed their response to the City's summary judgment motion.[3]  [Defendant's Reply

Brief, p. 3 (Dkt No. 57).]  Finally, Plaintiffs' response to the City's summary judgment motion fails

---

[2]    Although the City points out Plaintiffs' critical pleading deficiencies in its summary judgment brief, it did not file an early motion to dismiss Plaintiffs' defamation claims.

[3]    Plaintiffs are hard pressed to convince us that they were unaware of the existence of these documents until after the City filed its summary judgment motion because Plaintiffs' *own counsel of record in this case*, Robert Turner, is quoted in those documents (two news articles printed off of the WTHR website).  Moreover,  those documents were published on December 31, 2008 and June 22, 2009 – dates *well before* the City served its discovery requests. [Gadson Aff., Exhibits A & B (Dkt. No. 50-3).]   "Surprise" litigation tactics are strongly disapproved of by the Court; and although the City asks us to strike the news articles pursuant to Fed. R. Civ. P. 37(c)(1), we do not do so because, even accepting them, Plaintiffs' defamation claims fail as a matter of law.

to comply with Local Rule 56-1(e) in that Plaintiffs have failed to support the "facts" asserted within

their response with even a single *proper citation* to the record.[4]  Indeed, instead of asserting a "fact"

and then providing the citation to the place in the record where that fact can be found by page and

line number, Plaintiffs "designate" or reference whole categories of documents, including "[a]ll of

the pleadings filed in the present case" and "[a]ll of the materials designated by the Defendant in

support of its Motion for Summary Judgment." [Plaintiffs' Designation of Evidence, p. 1 - 2 (Dkt.

No. 50); Plaintiffs' Response Brief (Dkt. No. 51) (discussing "facts" without properly citing to the

record).]  These multiple failures demonstrate a serious lack of diligence on the part of Plaintiffs

and, in particular, their counsel, so serious that it leaves us wondering about counsel's competency.

        In any event, after the City has spent considerable time and financial resources defending

this case (three-fourths of which has now been dismissed) and prepared and filed a summary

judgment motion, which is fully briefed and ready for ruling, Plaintiffs would have us send this case

back to state court for it to be resumed there.  The City characterizes this late-breaking attempt to

move the case back to state court as a "manipulation of the judicial system," suggesting that because

Plaintiffs suspect they will not prevail in federal court, they seek to return to state court for a second

bite at the apple.  Of course, we have no way of knowing Plaintiffs' motives, but we agree that the

City would be unfairly prejudiced by having to spend more time and resources defending this

lawsuit in state court when the matter is so close to final resolution here.  We also agree that

Plaintiffs' conduct of this litigation in this court does not merit the opportunity for, as the City has

---

[4]    Local Rule 56-1(e) provides: "A party must support each fact the party asserts in a
brief with a citation to a discovery response, a deposition, an affidavit or other admissible
evidence.  The evidence must be in the record or in an appendix to the brief.  The citation must
refer to a page or paragraph number or otherwise similarly specify where the relevant
information can be found in the supporting evidence."

put it, a "start over" in state court.

A district court is afforded significant discretion when determining whether to remand pendent claims based upon "the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." Carnegie-Melon Univ. v. Cohill, 484 U.S. 343, 357 (1988).  Under Seventh Circuit law, "[the] general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state law claims rather than resolving them on the merits." Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 727 (7th Cir. 1988) (quotations omitted).   However, there are several exceptions to this general rule, such as when: (1) "the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court;" (2) "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort;" and (3) "when it is absolutely clear how the pendent claims can be decided." Wright v. Assoc. Ins. Cos., 29 F3d 1244, 1251 (7th Cir. 1994) (internal quotations and citations omitted).

For the reasons detailed below, we find that it is absolutely clear that Plaintiffs' state law defamation claims fail as a matter of law.  We will therefore exercise our supplemental jurisdiction over those pendent claims and proceed to address them.  Principles of fairness and comity are not furthered by prolonging "doomed litigation by sending it back to state court to be dismissed there." Sullivan v. Conway, 157 F.3d 1092, 1095 (7th Cir. 1998).

### III.  FACTUAL BACKGROUND

In the months leading up to the date of December 12, 2008, Plaintiffs Webster and Edmond were employed by the City of Indianapolis Department of Parks and Recreation.  Webster worked as both the Manager of Washington Park, with specific oversight responsibility for Washington Park, and as one of the City's Senior Park Managers, with general oversight responsibility for the

City's entire park system. Edmond worked as both the Facility Attendant and the Recreation Coordinator for Washington Park. The plaintiffs' regular offices were located at Washington Park at 3130 East 30th Street in Indianapolis.

On November 15, 2008, Cassandra Shelby, who had been working as the Park Manager at another of the City's parks, was transferred to Washington Park to serve as its Assistant Park Manager. [Shelby Aff., ¶ 6 (Dkt No. 36-8).] As Washington Park Assistant Park Manager, Ms. Shelby was supervised by Webster, but she had supervisory responsibility over Edmond. [Id., ¶ 8.] During the period of time relevant to the claims asserted in this action, Webster, Edmond, and Ms. Shelby were the only full-time employees working at Washington Park. [Id., ¶ 9.] As the Washington Park Assistant Park Manager, Ms. Shelby was tasked with "ensuring compliance of department policy and procedures," "assisting to monitor all facets of park management in division," and "tracking the event planning." [Id., ¶¶ 10, 11 & 16.] Event planning was tracked in part by a physical calendar kept at the park office front desk. [Id., ¶ 12.] When members of the community wanted to rent a park facility (presumably, a shelter house or event room), Webster, Edmond, Ms. Shelby, or a volunteer would write down the date and time of the individual reservation on the physical calendar. [Id.] In addition to the physical calendar, the City maintained an online database in which it kept track of the facility rentals at all of its various parks. [Id., ¶ 13.] That database was known as the "Class" system. [Id.] In accordance with City policy, facility rentals (also referred to as "events") were also entered into the online "Class" system whenever a community member paid his or her deposit to use a park facility. [Id., ¶ 14.]

After working at Washington Park for a period of time, Ms. Shelby began to notice some discrepancies between the physical calendar that was maintained at the park's front desk and the online database. [Id., ¶ 17.] Specifically, she noticed that there were a number of events that had

been booked at Washington Park as noted on the physical calendar that did not appear in the "Class" system.  [Id., ¶ 18.]

In addition, on evenings when Ms. Shelby closed Washington Park for the night, she was responsible for "doing" the park's cash reports.  [Id., ¶ 19.]  In performing this task, she noticed on more than one occasion that "the actual money in the drawer did not add up to the amount that should have been in the drawer based on the events booked."  [Id., ¶ 21.]  To confirm that the events in question had been booked, Ms. Shelby contacted some of the people who had booked those events and inquired whether they had paid their reservation fees.   [Id.,  ¶ 22.]  The community members she contacted all confirmed that they had paid their reservation fees and had given their money to either Webster or Edmond.  [Id.]

Ms. Shelby spoke to Webster about the discrepancies between the physical calendar and the "Class" entries.  According to Ms. Shelby,  Webster explained that some events at Washington Park were not entered into the "Class" system because of verbal agreements with certain community members and organizations.[5] [Id., ¶ 23.] Ms. Shelby was uncomfortable with Webster's explanation because she knew that the City mandated that all events be placed into the "Class" system for purposes of the City's accounting records.   [Id.,  ¶ 24.]

Further, according to Ms. Shelby, not long after Webster told her that not all facility rentals and events at Washington Park were entered into the "Class" system,  Edmond approached her, told her that he and Webster took turns "skimming" money from the rental deposits, and invited her to

---

[5]     Webster denies that he made any such statement to Ms. Shelby. [Webster Aff., ¶ 25 (Dkt. No. 50-1).]  However, his denial does not create a genuine issue of material fact precluding summary judgment because the issue before us is not whether Webster actually made the statement or whether the matter asserted is true, but whether the City published defamatory communications about Plaintiffs.

participate in the scheme.[6]  [Id., ¶ 25.]  Ms. Shelby declined Edmond's invitation and reported her belief that there was a problem to Senior Parks Manager, Linda Koontz.  [Id.,  ¶ 26.]  Ms. Koontz then contacted her superiors about the matter, and Stuart Lowry, Director of the Department of Parks and Recreation, decided to suspend the employment of both Webster and Edmond pending a formal, internal investigation of the matter. [Lowry Aff., ¶ 11 (Dkt. No. 36-10).]  Accordingly, on December 1, 2008, at approximately 5:00 p.m., Webster and Edmond were notified that their employment with the City was suspended, and they were escorted out of the Washington Park facility. [Id., ¶12.]

On December 2, 2008, the City's Internal Audit Agency was asked to investigate the matter. [Id., ¶ 13.]  When the investigation was complete, the Audit Agency determined that there were "267 instances of possible usage of the facilities within Washington Park that showed no reservation, and therefore no evidence of payment, within the 'Class' system." [Id., ¶ 14.]  The Audit Agency also concluded that "there was a high probability that there had been both usage of the Washington Park facilities without proper rentals posted to the 'Class' system and also theft of rental properties at the facility."[7] [Id., ¶ 15.]  Based on the results of the investigation, Mr. Lowry decided to terminate Webster's and Edmond's employment with the City. [Id., ¶ 16.]  On December 12, 2008, the City separately notified Webster and Plaintiff that their employment with the City had been terminated for the "misappropriation and mishandling of funds." [Webster Aff., ¶ 18;; Edmond Aff., ¶ 21.]

---

[6]    Edmond denies that he made any such statement to Ms. Shelby. [Edmond Aff., ¶ 26, subsection #25 (Dkt. No. 50-2).]  However, again, his denial does not create a genuine issue of material fact precluding summary judgment because the issue before us is not whether Edmond actually made the statement or whether the matter asserted is true, but whether the City published defamatory communications about Plaintiffs.

[7]    Plaintiffs deny that they misappropriated or mishandled facility rental fees, dispute the audit's findings, and characterize the audit as "recklessly incompetent." [Webster Dep., ¶ 16 (Dkt. No. 50-1); Edmond Dep, ¶ 19 (Dkt. No. 50-2); Plaintiffs' Response Brief, p. 3.]  However, as explained below, neither plaintiff's denial of wrongdoing or assertion that the audit was a sham creates a genuine issue of material fact precluding summary judgment.

On December 17, 2008, Ms. Koontz contacted a law enforcement officer with the Indianapolis Park Rangers' office and reported her knowledge of the Webster-Edmond matter. [Koontz Aff., ¶ 20 (Dkt. No. 36-9).]    Based on Ms. Koontz's statements, Park Ranger Paul Berninger created a police report and opened an investigation.  [Indianapolis Metro. Police Dep't Case Report (Docket No. 36-13)].

On December 31, 2008, WTHR news reporter Sandra Chapman called Webster on the telephone and said, "Hey, your name is on the police report, and we're going to run a story about you in this report, but we want to hear your side of the story first." [Webster Dep. at p. 36, l. 4 - 37, l. 4]  Until that telephone call, Webster had been unaware of the existence of a police report.  [Id. at p. 37, l. 9 - 12.]

On December 31, 2008, and again on January 1, 2009, Webster saw televised reports on the WTHR six o'clock news broadcast regarding his termination from his job with the City.  [Id. at 34, l. 19 - 36, l. 3.]  Edmond saw the same or similar televised reports.  [Edmond Aff., ¶ 23.]  In sum, the televised reports referenced "police reports" and stated that Webster and Edmond had been accused of "pocketing" permit money for facility rentals.  [See Gadson Aff., Ex. A.]  They also asserted that Webster and Edmond had been "fired" from their jobs and indicated that the City had launched "an internal and criminal investigation" of the matter.[8] [Id.]  These televised news reports prompted Plaintiffs to file their separate lawsuits that became the case now before us.  [See generally, Plaintiff's Response Brief, p. 6 - 7 & 9 (referencing the police report and WTHR's "re-publication" of Plaintiffs' job terminations).

---

[8]    Criminal charges were never filed against either Plaintiff Webster or Plaintiff Edmond with regard to their suspected misappropriation or mishandling of funds. [Webster Dep., ¶ 21; Edmond Dep., ¶ 24.]

## IV.  STANDARD OF REVIEW

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).   Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of that party.  See id. at 255.  However, neither the "mere existence of *some* alleged factual dispute between the parties," id. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The party seeking summary judgment on a claim for which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325.  According to the Seventh Circuit's reading of the Celotex standard, summary judgment is appropriate where the non-moving party fails to establish "an element essential to his claim." Beauchamp v. City of Noblesville, 320 F.3d 733, 742 (7th Cir. 2003) (citing Celotex, 477 U.S. at 322).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore,

after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enters. v. First Chi. Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but *mandated*. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

## V. PLAINTIFFS' DEFAMATION CLAIMS

To establish defamation, a plaintiff must prove the existence of: (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. Dugan v. Mittal Steel, 929 N.E.2d.184, 187 (Ind. 2010). A communication is defamatory if it tends "to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person." Id. (quoting Kelley v. Tanoos, 865 N.E.2d 593, 596 (Ind. 2007)). "Any statement actionable for defamation must not only be defamatory in nature, but false." Trail v. Boys and Girls Clubs of NW Ind., 845 N.E.2d 130, 136 (Ind. 2006).

"A communication is defamatory *per se* if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office or occupation; or (4) sexual

misconduct." Baker v. Tremco, Inc., 917 N.E.2d 650, 657 (Ind. 2009).  If a communication is defamatory *per se*, damages need not be proved because they are "presumed" as the "natural and probable consequence" of the defamation. Id. Here, Plaintiffs assert that the City's communications about them constitute defamation *per se* because the communications alleged that they had engaged in misconduct and criminal conduct while employed at the Park's Department.  [See Plaintiff's Response Brief, p. 6 - 7.]  Unless material facts are in dispute, whether a communication is defamatory is a question of law for the court.  Baker, 917 N.E.2d at 657.

### A.  The communication at issue is the City's police report

Under Indiana law, a plaintiff asserting a defamation claim must include the allegedly defamatory communication in his or her complaint.  Trail, 845 N.E.2d. at 136 - 37.  This requirement is imposed because, without such inclusion, neither the court nor the defendant is on notice of the disputed words. Id. at 137.  The court is "handicapped" in such situations because it cannot determine whether the communication is legally defamatory and the defendant is "placed on unfair footing" because the defendant does not know how to present a defense.  Id.

Significantly, neither plaintiff in the case before us expressly referenced the City's allegedly defamatory communication in his complaint.  All that Plaintiff Webster alleged in his Complaint regarding defamation was:

> 7.  That during and following Webster's dismissal, the City imputed malicious publications concerning Webster.
>
> 8.  That said publications also concerned Webster's trade without resorting to extrinsic facts or circumstances.

[Webster Complaint, ¶¶ 7 - 8 (Dkt. No. 1-4)]. Likewise, the only reference by Plaintiff Edmond on the subject of defamation in his Complaint was:

12

      7.     That during and following Webster's dismissal, the City imputed malicious publications concerning Webster.

      8.     That said publications also concerned Webster's trade without resorting to extrinsic facts or circumstances.

[Edmond Complaint, ¶¶ 7 - 8 (filed in Cause No. 1:10-cv-1623 at Dkt. No. 1-4).]  Because neither Complaint included the defamatory statement at issue, both pleadings were seriously deficient, and it is likely that neither would have survived a motion to dismiss had such a motion been filed.

Nevertheless, the summary judgment filings of both parties have fleshed out Plaintiffs' claims. Based on the evidence before us, which we accept in a light most favorable to Plaintiffs, as we are required to do at this stage in the litigation, we find that, even though Plaintiffs have never expressly said so, the communication at issue upon which they base their defamation claims is obviously the City's police report. We base this finding on Webster's deposition, wherein he testified that he learned of the existence of the City's police report from a news reporter. [Webster Dep. at p. 36, l. 4 - 37, l. 10.] We also rely on the plaintiffs' affidavits, wherein they each testify that, "[a] *police report* I read dated December 17, 2008, falsely alleges that I was pocketing and diverting funds." [Webster Aff., ¶ 22; Edmond Aff., ¶ 25.] Further, we base this finding on Plaintiffs' response to the City's motion for summary judgment in which Plaintiffs assert: "The City followed up with a police report falsely alleging theft and misappropriation of funds . . . which allegations "were then re-published to the general public" by WTHR. [Plaintiffs' Response Brief, p. 3 & 9.]

In fact, Plaintiffs' defamation claims in this action *must* be based on the City's police report because there are no other communications in the record that could possibly form the basis of those

claims.[9]   Accordingly, the question in this case is whether the City's police report is defamatory.

### B.  The City's police report is protected by a qualified privilege

The police report is a written summary of the statements made by Ms. Koontz to Park

Ranger Berninger and provides, in sum, that:

> A law enforcement officer with the Indianapolis Park Rangers was
> dispatched . . . on a theft report. . . . [Ms. Koontz told the officer she
> had been informed that] Mark Webster and Darrell Edmonds [sic] .
> . . [were] diverting funds from the City. . . . [that] they would pocket
> some of the permit money for themselves . . . depriving Indy Parks
> of revenue . . . . [and that] funds were possibly diverted from May
> 2008 through November 2008 . . . .

[Indianapolis Metro. Police Dep't Case Report (Docket No. 36-13)].

The City does not deny that the words about "theft,"  "pocketing money," "depriving" the

City of revenue, and "diverting funds" are the type of language that can harm a person's reputation

by diminishing the person in the eyes of the community.  Rather, the City argues that the police

report is not defamatory as a matter of law because it is protected by a qualified privileged.

"A qualified privilege 'applies to communications made in good faith on any subject matter

in which the party making the communication has an interest or  in reference to which he has a duty,

---

[9]     On deposition, Webster testified that he "believed" Ms. Shelby had defamed his
character "for just talking about [him] to the public" and telling the public "information that was
not relevant when they come to rent a facility." [Webster Dep. at p. 32 - 33.]  Similarly, Edmond
testified that he "heard [that] a lot of people" had asked Ms. Shelby about him and that she had
said,  "'they are fired,' 'they are no longer here,' 'they took something,' 'they will no longer be
back,' and stuff like that." [Edmond Dep. at p. 40.]  Although the City acknowledges this
deposition testimony in its summary judgment brief, Plaintiffs do not cite it or otherwise rely
upon it to defeat the City's motion – *nor could they*.  Webster's testimony is inadmissible
speculation, and Edmond's testimony is inadmissible hearsay. Hanners v. Trent, 674 N.E.2d 683,
695 (7th Cir. 2012) (mere speculation without more is insufficient to avoid summary judgment);
Fed. R. Evid. 801.  Moreover, even if Ms. Shelby said the things that Edmond claims she said,
her statements were so vague, generic, and lacking in content that they would not constitute
defamation as a matter of law.  And, while Plaintiffs have not suggested otherwise, it goes
without saying that the news articles Plaintiffs' counsel found on the Internet were written and
published by WTHR– not the City.

either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." Williams v. Tharp, 914 N.E.2d 756, 762 (Ind. 2009) (quoting Bals v. Verduzco, 600 N.E.2d 1353, 1356 (Ind. 1992)). "As a defense to defamation, the qualified privilege operates not to 'change the actionable qualify of the words published, but merely [to] rebut[] the inference of malice that is otherwise imputed.'" Id. (quoting Holcomb v. Walter's Dimmick Petroleum, Inc., 858 N.E.2d 103, 106 (Ind. 2006)). "[T]he burden is upon the defendant in the first instance to establish the existence of a privileged occasion for the publication, by proof of a recognized public or private interest which would justify the utterance of the words." Id. (quoting Bals, 600 N.E.2d at 1356.) "Absent a factual dispute, whether a statement is protected by a qualified privilege is a question of law." Bals, 600 N.E.2d at 1356.

Plaintiffs suggest that there is a factual dispute which precludes us from finding, as a matter of law, that the police report is qualifiedly privileged. [10] They point to their own affidavits, wherein they testify that they did not mishandle or misappropriate any facility rental funds and suggest that their denial of wrongdoing creates a genuine issue of material fact as to the falsity of the police report. We find this argument unavailing.

The purpose of the qualified privilege in the context of defamation is to protect a speaker from liability notwithstanding the fact that his communication was mistaken, inaccurate, or false. Williams, 914 N.E.2d at 767. Liability for defamation does not exist where statements are true, so there is no need to invoke the privilege with respect to a true statement. Id. (noting that in a qualified privilege action, the reporting citizen is "necessarily mistaken" and "the privilege exists to protect tipsters from liability for making inaccurate reports."). In asserting that the police report

---

[10]     Plaintiffs have not expressly made the argument, having instead simply danced around it, but we address it in effort to be both thorough and fair.

15

is protected by a qualified privilege, the City necessarily concedes for the sake of argument that its suspicions regarding Plaintiffs' wrongdoing as reported to law enforcement were inaccurate. See id.; see also Defendant's Reply Brief, p. 8 (arguing in the alternative that, "[e]ven if the Plaintiffs have made a *prima facie* case of defamation[,] . . . the City is entitled to [a] qualified privilege on those claims."). Consequently, there is no question of material fact to be decided as to the underlying truth of the allegation that Plaintiffs mishandled or misappropriated funds (or, put differently, the accuracy of the information that Ms. Koontz provided to Park Ranger Berninger) because, for purposes of determining the applicability of the qualified privilege, it is assumed that Plaintiffs did not mishandle or misappropriate funds.

The Indiana Supreme Court has expressly recognized that communications to law enforcement officials in connection with the reporting of suspected criminal activity are qualifiedly privileged. Kelley, 865 N.E.2d at 600. Here, the City had information indicating that it had been the victim of the theft, embezzlement, or misappropriation of public funds. That information included Ms. Shelby's observations and statements to her superiors, the discrepancies between the physical calendar and the "Class" system computer entries, and the Audit Agency's report. Thus, it was perfectly appropriate for the City, through Ms. Koontz, to communicate the foregoing to a law enforcement officer for appropriate follow-up. In fact, we suspect that the City would have grossly neglected its duty to protect the public's money had it ignored the apparent discrepancies and failed to make a such report. Accordingly, we find that the police report was, and is, protected by a qualified privilege.

### C. Plaintiffs have not established that the qualified privilege was abused

Once it has been established that a communication is qualifiedly privileged, the burden shifts to the plaintiff to overcome the privilege by showing that the privilege was abused. Bals, 600

N.E.2d at 1356.  The concept of "abuse" relates to the speaker's "abuse of the privileged occasion by going beyond the scope of the purposes for which the privilege exists."  Williams, 914 N.E.2d at 762 (quoting Holcomb, 858 N.E.2d at 106 - 07).  A communication can lose its privileged status upon a showing by the plaintiff that: "(1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth."  Id. at 762 - 63 (quoting Bals, 600 N.E.2d at 1356).

Plaintiffs suggest that any privilege which otherwise might have attached to the police report is inapplicable because the City abused such privilege.[11]   They assert:

> Without any semblance of a structured audit genuinely attempting to match monetary receipts in an audit period with actual confirmed paying customer [sic] in the same time period, the City should not be given the benefit of doubt that it had grounds for belief that it was acceptable to communicate to the public that the Plaintiffs were thieves.  To rule otherwise at summary judgment is to give all accused slanders [sic] a convenient, ready-made excuse which can never be defeated as a practical matter.  Parities [sic] in such disputes almost always allege that grounds existed for the belief in the false statement.

[Plaintiffs' Response Brief, p. 11.]

Based on this single, confusing paragraph, we understand Plaintiffs' argument to be that the methods employed by the Audit Agency in conducting the audit were so flawed and unreliable that no reasonable person could have found its resulting findings valid, leaving Ms. Koontz without grounds for believing the truth of her communication to Park Ranger Berninger and, thus, defeating the privilege.   This argument, however, gets Plaintiffs nowhere because it is only that – an argument.  Arguing that the audit was faulty and unreliable does not make it so, particularly when

---

[11]   Again, we use the word "suggest" because Plaintiffs similarly dance around this argument.

Plaintiffs have failed to cite a single item of evidence in the record suggesting that there was a problem the audit.  In any event, the audit was not the City's only evidence that funds had been mishandled or misappropriated. The City's evidence also consisted of Ms. Shelby's observations and statements to her superiors and the discrepancies between the paper calendar and the "Class" system computer entries.  Consequently, even if the audit were faulty, the City had ample other evidence of wrongdoing that it could have honestly, even if mistakenly, believed.

Plaintiffs have not come forward with any evidence supporting a reasonable inference that the City's agents, including Ms. Koontz lacked a belief or grounds for believing the truth of the information that was provided to Park Ranger Berninger.  Consequently, Plaintiffs have not overcome the qualified privilege.

## VI.  CONCLUSION

"[S]ummary judgment is the put up or shut up moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) (internal citations omitted).  At this stage in the litigation, Plaintiffs have presented the Court with nothing beyond their allegations and self-serving arguments which are otherwise entirely unsupported by evidence in the record.  Summary judgment in favor of the City is therefore GRANTED.  A separate judgement shall issue awarding costs to Defendant.

IT IS SO ORDERED.

Date:   09/26/2012

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

18

Copies to:

Beth Ann Dale
CITY OF INDIANAPOLIS, CORPORATION COUNSEL
bdale@indygov.org

Gregory P. Gadson
LEE FAIRMAN LLP
ggadson@nleelaw.com

Robert B. Turner
LEE FAIRMAN LLP
rbtatty@aol.com

Alexander Phillip Will
OFFICE OF CORPORATION COUNSEL
awill@indygov.org